IN THE MATTER OF THE APPLICATION OF ABBOTT LOW MOFFAT FOR A RECHECK OF A VOTING MACHINE AND TO CONTEST THE ELECTION RESULTS IN THE 12TH DISTRICT OF PRINCETON TOWNSHIP.

THE TOWNSHIP OF PRINCETON, IN THE COUNTY OF MERCER, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. JUNIUS J. BLEIMAN, MARGARET BROADWATER, MEMBERS OF THE PRINCETON TOWNSHIP COMMITTEE, AND JOSEPH R. NINI, PRINCETON TOWNSHIP CLERK, DEFENDANTS-RESPONDENTS, AND ELIZABETH HUTTER AND JOSEPHINE HALL, AS MEMBERS OF THE PRINCETON TOWNSHIP COMMITTEE, DEFENDANTS-APPELLANTS.

Superior Court of New Jersey
Appellate Division

Argued April 26, 1976—Decided June 8, 1976.

218

Before Judges FRITZ, SEIDMAN and MILMED.

*Mr. Edward B. Meredith* argued the cause for appellants Republican Municipal Committee of the Township of Princeton and Todd Peyton, candidate for election for the office of township committeeman, in Docket No. A–872–75, and for defendants-appellants Elizabeth Hutter and Josephine Hall in Docket No. A–1663–75 (*Messrs. Meredith, Meredith & Chase,* attorneys).

*Miss Joyce M. Usiskin* argued the cause for plaintiff-respondent Abbott Low Moffat in Docket No. A–872–75, and for defendants-respondents Junius J. Bleiman and Margaret Broadwater in Docket No. A–1663–75 (*Mmes. Usiskin & Mueller,* attorneys).

*Mr. William F. Hyland,* Attorney General of New Jersey, filed a statement in lieu of brief on behalf of Mercer County Superintendent of Elections, Mercer County Board of Elections and the Secretary of State, in Docket No. A–872–75 (*Mr. Gregory E. Nagy,* Deputy Attorney General, of counsel).

*Messrs. Mason, Griffin & Pierson,* attorneys for plaintiff Township of Princeton in Docket No. A–1663–75, did not file a brief.

The opinion of the court was delivered by

SEIDMAN, J. A. D. These consolidated appeals arise out of a contest for member of the Princeton Township Committee at the general election held on November 4, 1975. One is from the judgment below setting aside the election of a Republican candidate for that office and directing that no certificate of election be awarded either to him or to the Democratic candidate. The other is from the judgment in a related suit brought by the Township of Princeton for a construction of the Municipal Governing Body Vacancy Law (*L.* 1975, *c.* 213; *N. J. S. A.* 40:45B–1 *et seq.*), which judgment declared that the municipal governing body was

empowered under that law to fill the vacancy pending the 1976 general election, the appointee to be a member of the Democratic Party.

The issues to be resolved are, first, whether the malfunctioning of a voting machine in an election district, as a result of which only one vote was recorded for a candidate, was sufficient cause on the facts of this case to set aside the election of the opposing candidate; and, if so, whether the resulting vacancy was to be filled in accordance with the provisions of the Municipal Governing Body Vacancy Law.

At the general election here involved, four candidates, two Republicans and two Democrats, sought election to two three-year terms on the Princeton Township Committee. The total vote recorded for them was as follows:

| | |
|---|---|
| Josephine Hall (Republican) | 2419 |
| Todd Peyton (Republican) | 2270 |
| Abbott Low Moffat (Democrat) | 2178 |
| Barbara Lependorf (Democrat) | 2171 |

Included in the totals were 148 votes purportedly cast in the 12th Election District of the municipality by 143 voters. The voting machine tally was:

| | |
|---|---|
| Josephine Hall | 31 |
| Todd Peyton | 16 |
| Abbott Low Moffat | 1 |
| Barbara Lependorf | 100 |

Moffat, who had sought reelection as an incumbent member of the township committee, thereupon filed a verified petition for a recheck of the voting machine in that district, and also for a judgment setting aside the election of Peyton and certifying his election, or, in the alternative, ordering a special election in the district. An order was issued directing that Peyton show cause why his election should not be declared void, and further, that the voting machine be opened and the registering counters rechecked against the tallies.

At the subsequent hearing counsel stipulated that candidate Hall would in any event have won, and that candidate Lependorf would in any event have lost. The uncontradicted testimony of an expert witness who had examined the voting machine disclosed that a shaft connected to the counter wheel recording the votes for Moffat became dislodged, so that the wheel failed to move after the first vote was cast for him. The witness stated further that this was the only counter on the machine which had become disengaged. Four voters in the district testified that they had voted for Moffat, and an affidavit of a fifth voter to the same effect was submitted.

The trial judge found that the machine was "obviously defective so that the votes cast for Mr. Moffat are not counted." He observed that 148 votes were recorded out of a possible 286, and that "it is highly probable that the people who voted for Ms. Lependorf voted for Moffat or at least a sufficient number of them did so as to affect the outcome of this election." He rejected as unnecessary the request of opposing counsel for a further hearing, and entered judgment setting aside Peyton's election. However, he refused to certify the election of Moffat and denied the request for a special election. The appeal of Peyton and the Republican Municipal Committee of the township followed.

Addressing ourselves first to this aspect of the matter before us, we have no doubt that the setting aside of Peyton's election was correct. *N. J. S. A.* 19:29-1 permits the voters of this State or any of its political subdivisions to contest the election of any person to any public office upon one or more of the enumerated grounds. Although the verified petition in this case asserted as the applicable ground subparagraph (g) of that section — "[f]or any other cause which shows that another was the person legally elected" — we perceive no merit in appellants' contention that the petition should have been dismissed because of Moffat's failure to prove that he "was the person legally elected." On the facts

adduced the trial judge correctly chose, in effect, to apply subparagraph (e) of the statute, which deals with situations when "illegal votes have been received, *or legal votes rejected at the polls sufficient to change the result*" [emphasis supplied]. It is to be noted that while the petition did refer to subparagraph(g), it also sought judgment for "any other relief which the Court finds just and equitable."

There is no allegation here of illegal voting. What is involved is whether the malfunction of the machine resulted in the rejection of legal votes sufficient to change the result.

The only reported case in this State in which an election was contested because of the mechanical breakdown of a voting machine is *Magura v. Smith,* 131 *N. J. Super.* 395 (Law Div. 1974). There, because of a malfunction, the voting machine could not be used for more than two hours. The losing candidate contended that a number of voters who were turned away were unable to return later in the day. He claimed that the inability of these voters to cast their ballots cost him the election. The trial judge held, we think correctly, that while the statute did not define the term "rejected," nor limit its application to any particular circumstances, "it is properly read to include any situation in which qualified voters are denied access to the polls including a denial because of shutdown of a voting machine." (At 399).

Although, in the case before us, voters were not "turned away," as in *Magura,* they were, nevertheless, denied the opportunity to vote for one of the candidates for office. Inability to cast such vote because of a partially malfunctioning voting machine is unquestionably as much a rejection of a legal vote as in the case of a complete breakdown of the machine.

That legal votes were rejected here is beyond doubt. Not only was there proof of five unregistered votes for Moffat, but there is also the fair inference that others were likewise unrecorded, in view of the fact that 100 votes were cast for

Moffat's running mate as against only 31 and 16, respectively, for the opponents.

Of course, it is not enough to show merely that legal votes were rejected; it must also be established that the number was "sufficient to change the result." *N. J. S. A.* 19:29-1(e). The burden of proof is upon the contestant. *Cf. Application of James T. Murphy,* 101 *N. J. Super.* 163, 167 (App. Div. 1968), certif. den. 52 *N. J.* 172 (1968). The problem, however, is how the burden is to be sustained in a case of this kind. When an election is contested on the sole ground that illegal votes were received, the contestant has not only the burden of showing that

> \* \* \* illegal votes were cast in number sufficient to change the result if they had in fact been cast for the contestee, but also the burden of showing, to the extent possible under the circumstances, for whom the illegal votes were cast. \* \* \* [*Application of James T. Murphy, supra* at 167]

We are of the view that the burden of showing specifically for whom votes were cast, while pertinent in cases of illegality, has no place where the issue is the rejection of legal votes. *Cf. In re Fifteen Registered Voters, Sussex Cty.,* 129 *N. J. Super.* 296 (App. Div. 1974), certif. den. 65 *N. J.* 577 (1974). In such situations, suitably modifying the quoted language, the contestant's burden would be met by a demonstration that had the votes been cast for him, the result would have been different. This, we believe, is the import of the phrase "sufficient to change the result," contained in *N. J. S. A.* 19:29-1(e). *Magura* suggests that in earlier cases involving election contests "this language has been interpreted to require a definitive showing that the number of votes irregularly cast or rejected was sufficient to have altered the outcome of the election." 131 *N. J. Super.* at 401. This may be so where illegal votes are involved, but we think "definitive" is too stringent a criterion in the case of unrecorded, legal votes.

Illegal votes are generally identifiable, and the number can usually be fixed without undue difficulty. But where a malfunctioning machine prevents the recording of votes for a contestant, it is unlikely that the number of rejected votes can be determined with any degree of precision. It is possible, in the case of illegal votes, to compel each such voter to disclose for whom he or she voted. See *Evid. R.* 31, *N. J. S. A.* 19:29-7. Here, however, while it might have been feasible to produce at the hearing the 143 persons who used the defective machine, each of them, since the legality of their votes was not in question, would have had the privilege of refusing "to disclose the tenor of his vote." *Evid. R.* 31.

The facts of this case are markedly different from those in *Magura v. Smith, supra.* There the losing candidate was faced with the impossible task of establishing that of the voters who were turned away from the polls while the machine was inoperative, those who either failed or were unable to return to vote later were sufficient to overcome the margin of defeat. We have no difficulty with the conclusion of the trial judge that the contestant there failed to sustain his burden, and that "it can not be said that the result of the election contravened or thwarted a free exercise of the popular will." 131 *N. J. Super.* at 402.

The decision below to set aside the election rested upon the trial judge's conclusion that it was "highly probable" that at least a sufficient number of persons who voted for Lependorf also voted for Moffat, so as to affect the outcome of this election. Although there was no way that he could determine it, it seemed to him, nonetheless, "that the citizens of district 12 should [not] be disenfranchised because the machine [didn't] work right." We entirely agree. It is known that 143 persons used the machine in question. With two members of the local governing body to be elected, there were 286 potential votes. Yet, only 148 were recorded for the four candidates, so that 138 cannot be accounted for.

Of course, it does not follow that every voter cast his or her ballot for both positions, and, indeed, some may have voted for neither. Nevertheless, comparing the number of votes cast for Barbara Lependorf with the much smaller totals for the two Republican candidates, and taking into account the glaring disparity between the 100 votes for Ms. Lependorf and the solitary vote for her running mate, there is a compelling inference that a substantial number of votes for Moffat were not recorded. Since only 92 votes separated Peyton and Moffat, the latter would have emerged the victor if he had received, as seems likely, at least as many votes as the other Democratic candidate.

Where irregularities are such "that the court cannot with reasonable certainty determine who received a majority of the legal votes, the election should be set aside." 3 *McQuillin, Municipal Corporation,* § 12.24 at 152. *Cf. Application of James T. Murphy,* 101 *N. J. Super. supra* at 168. And see *In re Application of Dorgan,* 44 *N. J.* 440 (1965). Such was the case here. The order setting aside the election of Peyton is accordingly affirmed.

As of January 1, 1976 the Princeton Township Committee consisted of four members, instead of five, of whom two were Republicans and two were Democrats.[1] The parties are in accord on the applicability of the Municipal Governing Body Vacancy Law (*L.* 1975, c 213; *N. J. S. A.* 40:45B-1 *et seq.*), which sets forth the procedure to be followed in the filling of a vacancy in the membership of a municipal governing body,[2] whenever such vacancy occurs "for any reason other

---

[1]Members of a township committee hold office for three years, *N. J. S. A.* 40:146–1. There is no provision for holding over until the qualification of their successors, as, *e.g.*, in the case of borough councilmen (*N. J. S. A.* 40:87–9).

[2]It is to be noted that *N. J. S. A.* 40:146–20, as amended by § 31 of *L.* 1975, *c.* 213, now provides that a vacancy occurring in the membership of a township committee shall be filled in the manner provided by the Municipal Governing Body Vacancy Law.

than the expiration of the term of office." There is general agreement that a vacancy here existed because it was "so declared by virtue of judicial determination."[3]

Because of conflicting views among the members of the township committee on how the vacancy law was to be applied, the township committee sought instructions from the court by means of a complaint for a declaratory judgment. It resulted in the adjudication here under review that the vacancy was to be filled by the governing body, and that the appointee (to serve until the next general election) had to be a member of the Democratic Party.

The arguments advanced by the appellants are not entirely clear. Their brief, which was filed in the Moffat litigation, was, by their motion and resultant order, made applicable

---

[3] L. 1975, c. 213, § 6 (N. J. S. A. 40:45B-1) provides as follows:
The office of any member of the governing body of any municipality shall be deemed vacant under any of the following conditions:

a. It shall be so declared by virtue of judicial determination;

b. A member's written resignation shall be filed with the municipal clerk;

c. A member shall refuse to qualify or to serve;

d. A member shall become incapable of serving;

e. A member shall have died;

f. A member shall no longer reside within the corporate limits of the municipality;

g. A member shall for a period of 8 consecutive weeks, without being excused by the majority of the members of the governing body, fail to attend and participate as a member of any of its meetings; or

h. It comes within the purview of R. S. 19:3-25.

N. J. S. A. 19:3-25 provides, in part, that a public office shall be deemed vacant when a person shall remove or be removed from office because his nomination or election thereto has been declared null and void, or when two or more persons receive an equal number of votes for the office. It would appear that this section is not applicable here. When Peyton's election was declared null and void, he had not yet assumed the office, so that he was not a person who was "removed from office" by the judgment below.

to the second judgment "in lieu of an additional duplicative brief." The questions posed are these:

a. Must an appointee be of the same political party as the Petitioner [Moffat] who was elected to serve a term from January 1, 1973 to December 31, 1975?

b. In the case of a committee deadlock, and the calling of a special election by the municipal clerk, is the person therein elected entitled to serve for the unexpired term or does he serve only until the next general election?

As for the first question, appellants seem to argue that if an appointment is to be made by the governing body, it may be from either political party "or, indeed, may be made of one without any political affiliation in the 'situation' here presented." We are not certain whether there is an additional contention that, in the circumstances here present, a special election must be called to fill the vacancy. But, whatever appellants' arguments may be, we are entirely satisfied of the correctness of the holding below.

Under the Municipal Governing Body Vacancy Law, vacancies are to be filled in the following manner (*N. J. S. A.* 40:45B-2):

a. If the vacancy occurs subsequent to September 1 preceding the general election which will occur in the next-to-the-last year of the term of the member whose office has become vacant, the office shall be filled for its unexpired term by appointment by a majority vote of the whole membership of the governing body.

b. If the vacancy occurs prior to September 1 preceding the general election in any year other than the last year of the term of the member whose office has become vacant, the vacancy shall be filled for the unexpired term at the next ensuing general election. The governing body by a vote of the majority of its whole membership may fill the vacancy temporarily by appointment until the election and qualification of a successor.

c. Whenever a vacancy to be filled for the unexpired term by the governing body is not filled within 30 days of the occurrence of the vacancy, the municipal clerk shall forthwith call a special election to be held as soon as practicable to fill the vacancy. * * *

It is thus apparent that the factors to be considered in determining the applicability of either subparagraph (a)

or subparagraph (b) are, first, whether the vacancy occurred subsequent or prior to September 1 preceding a general election; and, second, whether the general election is one which would occur in the next-to-the-last year of the term of the member whose office has become vacant or in any year other than the last year of the term of the member whose office has become vacant. There is no doubt that subparagraph (a) is not applicable here, since the vacancy obviously did not occur within the specified time period. The disputed general election was not one which occurred after September 1 in the next-to-last year of the term of a member whose office had become vacant.

The problem which arises is whether the facts of this case come within subparagraph (b), if its language is read literally. Did a vacancy occur prior to September 1 preceding the general election in a year other than the last year of the term of the member whose office has become vacant? Does this mean that a vacancy under the statute may occur only during an incumbent's term? We think not. It is true that no vacancy occurred here *during* the term of a member. When Peyton's election was set aside there was an incumbent whose term would not expire until the following January 1. And while a vacancy existed on January 1, it too did not occur during a term of office. But neither did it occur strictly because a term of office had expired; rather, it was because the election of Peyton, who would otherwise have taken office on January 1, was voided.

If the application of the statute is made to depend literally upon a vacancy occurring *during* a term of office, then no such vacancy occurred here. The statute, in that case, would not seem to fit a situation such as the one here, where the election of a successor to the then holder of the office is vacated prior to January 1, the date on which the successor's term would have begun.

But we do not think the statute should be construed so narrowly. The clear intention of the Legislature in en-

acting it was to establish, insofar as possible, a uniform procedure for the filling of all vacancies in the membership of municipal governing bodies. See *Garwood Republican Comm. v. Garwood Mayor and Council,* 140 *N. J. Super.* 593 (Law Div. 1976). According to the appended Committee Statement, the purpose of the statute was to prescribe separate procedures for the filling of vacancies occurring after September 1 of a next-to-the-last year of a term, and of vacancies occurring *at any other time.*

■ It is a settled tenet of statutory construction that regard must be had for the manifest intent of the Legislature, and, accordingly, words in a statute must be interpreted in context to serve the spirit of the law. *Asbury Park Bd. of Ed. v. Hoek,* 38 *N. J.* 213, 231 (1962). To except the instant case from the statute would frustrate the clear Legislative design to exclude only those cases where the vacancy, by reason of the expiration of the term of office, would be filled by the electorate in the normal course of events.

▪ ■ While the vacancy in this case did not occur within the time span prescribed in subparagraph (a), it did occur prior to September 1 preceding the general election "in any year other than the last year of the term of the member whose office has become vacant." A vacancy, caused by the voided election, existed on January 1, 1976, for on that date no one held documentary title to the office. *Abrams v. Smith,* 98 *N. J. L.* 319, 321 (Sup. Ct. 1922). See *Monte v. Milat,* 17 *N. J. Super.* 260, 268 (Law Div. 1952). The next general election, to take place November 1976, would thus occur in a year other than "the last year of the term of the member whose office has become vacant," and, of course, would be after September 1 of such year. Thus, the vacancy which concerns us here should fall within the purview of subparagraph (b). We are convinced that this is a sensible interpretation of the statute and one which fully comports with the expressed Legislative intent to provide

a uniform means for filling all vacancies in municipal governing bodies.

The vacancy, thus, is to be filled temporarily by a vote of the majority of the whole membership of the governing body, and will be filled for the unexpired term at the next ensuing general election (see subparagraph (b), *N. J. S. A.* 40:45B–2).

Appellant's concept that the person to be appointed may be a member of either political party, or of none, is a mistaken one. The previous incumbent of the office here involved had been elected thereto as the nominee of the Democratic Party. Section 3 of the statute clearly provides that

Every person appointed by the governing body * * * to fill a vacancy, either for the unexpired term or temporarily, shall have the qualifications required by statute to permit the appointee to qualify for election to said office, and if the previous incumbent had been elected to office as the nominee of a political party, *the person so appointed shall be of the same political party.* [*N. J. S. A.* 40:45B–3; emphasis supplied]

We do not intend to address ourselves to appellant's further question of what might happen in the event of a committee deadlock and the calling of a special election by the municipal clerk under § 2(c) of the vacancy law (*N. J. S. A.* 40:45B–2(c)). We shall not assume the inevitability of a failure or inability on the part of the township committee to fulfill its statutory obligations. But should that event occur and produce problems requiring judicial intervention and resolution, appropriate steps may be taken to that end.

The judgments under review are affirmed. No costs.